it is Youngberg v. General Motors number 227047. Counsel, you may proceed. Thank you, Your Honor. May it please the court, I'm Jeff Levinger for the appellants. The main issue in this case is whether the evidence raises a factual dispute that GM's 2013-15 passenger van was reasonably dangerous as it was designed. That issue turns on the consumer expectation test which asks whether ordinary users would consider the van to be more dangerous than it actually was. In other words, were the van's actual dangers, did they exceed the perceived dangers? And the answer I submit is yes, the actual dangers did exceed the perceived dangers for three reasons. First of all, ordinary users were unaware that the van's ESC system, which was used to provide stability in the case of rollovers, but it had the additional negative effect of extending stopping times and breaking distances. They were unaware of that. So how do you apply the reasonable expectation test or what consumers would believe it was defective or not if it turns on a fact that wouldn't be obvious to a consumer? I'm having trouble applying that test under those facts. Well, I think that's exactly right. I mean, this is a case where you can't tell by looking at the vehicle whether it has or does not have the forward collision warning or the AED. And that's why I think the consumer... So how would a plaintiff ever prove what the average buyer would believe this to be defective? And that's, I think that's precisely the point. The consumer expectation test is generally framed in terms of what an ordinary user would be aware of or not aware of. And here, not only were they unaware of the ESC and the effect that it had, but they were unaware that the van lacked available safety features that would have prevented or mitigated the risk of rearing collisions at highway speeds. Well, that might have been known. I mean, you could look at the manual and determine that some of those features were not present, but I don't think you could look anywhere. The consumer could look anywhere to know about this extended braking time. And that's right. And that's why I submit to you that because of that unawareness, that the vehicle became more dangerous than what they would have expected. The third... Well, counsel, this argument you're making this morning about the ESC... Right. Electronic Stability Control. I got that right? Yes, that's it. Did you present that argument in district court? Yes, we did. In the response to the motion for summary judgment, it was discussed at length on pages 2 and 3, discussed again on page 12, specifically there, paragraph 41, and then discussed again on page 16 of the argument section where the statement was made that users were not aware of the unsafe condition of the van, referring back to all the things previously said about why it was unsafe, including the ESC system, that while it was obviously a useful, required technology, it had the negative effect of extending stopping distances. I thought the theory, though, of unreasonable dangerous was the lack of these other features, the forward collision warning and the automatic emergency braking. How does that map onto your ESC argument? Well, the point is that with the ESC, which functioned perfectly fine in order to provide stability and prevent rollovers, you needed a corresponding offsetting technology in the form of the FCW, forward collision warning, or ADB... But wasn't the evidence that no van in 2013 of any kind had those other features? Well, that's what their experts said. However, there was additional evidence that GM itself had been developing the ADB and the FCW for literally 10 or 15 years. Their 2004 Cadillac had the FCW, their 2005... Well, I understand that, and you've made that point in your briefing, but there wasn't a van in existence in 2013 that had these features. And so how could the consumer expect that this feature would be in the van if it doesn't exist in any van anywhere? Well, that's a question they asked. Several times they asked the question, would an ordinary user expect that this van would have FCW? In other words, they would say, would you expect that it would brake for you via the ADB, or would you expect it to warn you via the FCW? I submit to you that that's the wrong question. That question, would you expect it to have this or would you expect it to do that, it conflates the safer alternative design with the real question on the consumer expectation test, which is the product danger. So no case requires proof that an ordinary user would know about and expect the particular specific safer alternative design, particularly when they're not aware of it. How can you expect something that the manufacturer prevented you from even knowing about? Aren't you making an argument against the test itself? Well, no, I think the test is crystal clear. Is the product more dangerous? No, no, no, the test has to do with consumer expectation. Right, and the courts frame it in terms of, was the product more dangerous than what an ordinary user would expect it to be? Yeah, what an ordinary user would expect it to be. Right. In context, and in context, there wasn't a van in existence that had these features, so how could a consumer expect these features to be included? Well, because GM made the choice at that time not to equip the van with ESC or FCW. In fact, by 2019 they did. Every other manufacturer of vans made that same choice, so why would a consumer have expected that this van would have had those features on it? The average consumer would have known it didn't have those features by just looking at the manual. It wouldn't have been in there. Well, I would distinguish this case from, say, for example, the Brewer case involving the motorcycle that lacked the lake protection. You could tell by looking at it that it doesn't have the lake protection. It's an open and obvious situation. You could tell here by looking at the manual that it didn't have those other two features to it. Well, I don't think there's any evidence of that, Justice Abello. Is that right? There's no evidence? That is, the owner's manual was not in evidence or pled or anything? It was not, and I don't think there's evidence that you could tell by looking or not looking whether or not it had this technology. In any event, the evidence here in this case does show that once GM chose to tell consumers about these collision avoidance systems that the consumers wanted it. They wanted the technology. They expected the vehicles to have the technology, and that was clear from the GM advertisements that were in evidence and discussed through the human factors. I thought the advertisements, though, were post-2013. They were in 2015, but I think the point is that since the technology has existed for... Well, you can't rely on the advertisements then, can you? Yes, because I think you can because they show what consumers would have expected earlier if GM had simply chosen to tell consumers about it at that earlier time. But it wasn't available at the time, right? It was available. On this van? Well... It was not an option on this van at the time. So they could have told consumers that they could in a vacuum do it all they wanted, but they still couldn't have gotten it on the van. No, the testimony was that GM made the choice not to put it on the van. They made the choice instead to put it on their luxury vehicles where they could sell it as an option and make a profit. But there was no technological reason whatsoever why they could not have put it on the van at any point in time. It seems to me that that is a slippery slope because the average consumer would know that car manufacturers typically put extra bells and whistles or even important safety features on more expensive cars. They've got to give a reason why the cars are more expensive. And so you wouldn't expect, the average consumer, I would think, would not expect every bell and whistle that the company could make just because you could find it available on other kinds of models. Well, what consumers were unaware of, in part, were the dangers of this particular van. It was highly unstable, difficult to drive, and difficult to stop. And because of that unawareness, it became more dangerous than what an ordinary user would expect without these commercially available technologies that would have prevented or mitigated the risk of rear-end collisions on the highway. So would this technology have made all GM vehicles safer? Yes. Okay. It would have. So, I mean, this argument could be made as to every GM vehicle that wasn't equipped with this. Well, what makes this van, I think, unique was its stability and handling problem. Okay, so this is sort of availability plus then. It was available plus there were dangerous conditions on the van that required them to put this on there. Right. We've made the point throughout that what we're talking about here are latent dangers, latent dangers in the van. And we're talking about really a latent technology. It's not a technology you can discern that the vehicle has by looking at it. And, indeed, every one of these plaintiffs, although it's an objective user test, every one of the plaintiffs said we weren't even aware of this at the time. We're aware of it now, and, in fact, we equip our own personal vehicles with FCW and AEB now that we know about it. But they were unaware of the availability. It seems like your argument may fit a little better with the risk utility test, the restatement third of the courts, but Oklahoma hasn't adopted that. We've got this consumer expectations test. And so you haven't really mentioned many cases this morning. Is there an Oklahoma case that helps you the most on consumer expectations? Yes. Well, let me mention several because they relate to the three things of which they are unaware. Okay. I'm interested in your best one because I've got a couple other questions, too. Sure. Go ahead. Well, the McPhail case, I think it's a very good case because it involves a transmission on a tractor that made it more difficult. It masked the fact that the vehicle was in gear while people were trying to bypass start it. And I think that's similar to the ESC here. It's analogous to that. The Huffman case, while it's a Colorado case, it doesn't apply to the consumer expectation test. Spill, Huffman? Huffman. Huffman? Yes, Huffman. That case involved the pipeline machine on the ski slope that was more dangerous than what an ordinary consumer would expect because it lacked an automatic braking system that would have held it on the slope when the engine was off. So I think in that sense, it's analogous to what I'm saying. The product is more dangerous than what a consumer would expect because it lacked available safety features, just like the Huffman pipeline machine lacked the available safety feature of the automatic braking system. I think the Heiner case is very helpful when it comes to the unawareness of the long perception and avoidance time. Huffman made it very clear that we don't focus upon general dangers. We focus upon the more specific dangers. So even though you may know that a front-end loader could dump a bale of hay on you, what they didn't know in that case was that the front-end loader could self-raise. So I think that aligns very closely with our point that consumers were unaware of the long perception and reaction time involved in stopping a vehicle of this size and of this weight. Was there any evidence from an expert on what a reasonable consumer would have expected? Absolutely. We had three experts. None were stricken. We had Mr. Heineman in his declaration in paragraphs 8 through 10. We had Mr. Peck talking about the ESC and the dangers that it presented. And then we had Mr. Vigilante. I know. They talked about the dangers. I'm familiar with that. But were they experts on what the consumer would expect? Yes. So how did they document that expert opinion? Did they do consumer research at all? That's what I'm interested in. Yes. Well, Heineman talked about it in paragraphs 8 through 10. Vigilante, who wasn't mentioned in the district court opinion, was a human factors expert. He discussed at length the GM ads and surveys, which indicated that people, once they were told about ESC and FCW, expected it, wanted it, and they were unaware of the dangers that necessitated it. So, yes, we had three experts talking about it. And the district court mentioned only one of them. And none of them were stricken at all. So there's some discussion, not a lot, but some discussion in the briefs about failure to warn. Yes. So I've been trying to piece together the Oklahoma law on this, so I wonder if you could help me with this question. Under Oklahoma law, must the product be unreasonably dangerous to trigger a duty to warn? What I mean by that is, could failure to warn itself render the product unreasonably dangerous? Under Oklahoma law, I believe the answer is yes. And what case do you have to support your answer? There's a footnote in the Braswell case, I think, that says that, well, it says if a product is defective, a warning can cure that. But I think the converse is true as well, that if you have a warning that's inadequate, that the product could be defective. Yeah, OK, because I think you may see where I'm going with this, which is to say, if we disagree with you on the design defect consumer expectations test, would you still have an independent failure to warn argument? I think we do, because these failure to warn cases turn on whether the danger is open and obvious. And as I've outlined here, the dangers are not open and obvious. This is not like the Brewer case. This is not the lampy burning cigarette case. These are latent defects involving a latent design. Also, just would add that we've got a negligence per se claim that the court didn't even talk about, which turns upon 49 U.S.C. 30118 and 30166. These are federal claims alleged in paragraph 66F and G of our complaint. So we have a negligence per se claim. How would you distinguish your failure to warn claim from the one in the Butler case, the Butler versus Daimler Chrysler, the truck case that Judge Hartz, Holmes, and I were on recently? Well, I see I'm way over time, but I'll, can he answer? Please do, yeah. Yeah, Butler's distinguishable on three grounds, Judge Carson. Number one is there was no expert testimony whatsoever in that case. The parties stipulated that it was a legal question that they were to answer. No expert testimony at all. Secondly, the users in that case were professional truck drivers. They were not the injured plaintiffs who specifically knew about and declined to equip their vehicle with FCW and AEB. And the court used that to support the more general proposition that users of this heavy-duty truck, professional truck drivers, didn't think that the truck was more dangerous than they might expect because it was equipped with air brakes that functioned fine. And with respect to the warning claim, the court looked to the actual knowledge, the admitted actual knowledge of these professional truck drivers where they said, look, we know about this very specific danger at issue here, distracted driving and driving too fast and not sufficiently braking in a construction zone. So you had actual specific knowledge of this specific danger, which is not present in our case. So for all three reasons, I would submit the case to distinguishable. Thank you. Thank you, counsel. Good morning, Your Honors. Excuse me. Derek Linkus on behalf of General Motors and may it please the court. I want to jump right into the arguments that we heard on the top side. And Judge Ebell, you asked where a consumer could look to find out about ESC, setting aside the preservation point, which I think is important. Well, they could look at the Federal Register because ESC had been mandated on this vehicle before it was sold. Indeed, it was mandated on all vehicles over 10,000 pounds. That's Federal Motor Vehicle Safety Standard 126. And in fact, General Motors had equipped all of its large passenger vans with ESC since 2004. So nearly a decade before this van was manufactured, ESC was baked in. And Judge Carson, I think your observation about Appellant's argument is exactly right. It's exactly what the district court said on page four of its slip opinion, is that the argument that is being raised here could be made about every single motor vehicle out there that has ESC, which we know is all of them because it's federally mandated, and does not have these, what the court in Butler called nascent AEB and FCW technologies. And I think the district court also correctly recognized that Appellant's arguments really fit into two buckets. One is sort of, I don't mean it pejoratively, but backdooring the risk utility test into the consumer expectations world. And two, non-product specific expectations. So, for example, we heard, you know, citations to Dr. Vigilante. He talks about driver expectancies about driving, not about driving the 15 passenger van. And we know the test, it's been well set out by this court, and the Kirkland case from the Oklahoma Supreme Court is a seminal case. The test is whether at the time of manufacture, the product, that is this particular 2013 van, was dangerous to an extent beyond that which would be contemplated by the ordinary consumer. And the answer to that is just plainly no. I heard a lot of discussion from my friend on the other side about sort of General Motors superior knowledge, or, you know, what consumers did or did not expect. Braswell takes this head on. I mean, that's the knock on the consumer expectation test is that, you know, allegedly a manufacturer, contrary to the facts here, allegedly a manufacturer would hide technologies from the consumer public that would be easy to install. And this court in Braswell said that's why the restatement third went to the risk utility test. But Oklahoma has been resolute that that is not their test. Their test is the ordinary consumer. Would you say, though, that if the technology was available and feasible, that that would be at least relevant to the consumer expectations test? I think it is a relevant consideration. This court has acknowledged that the state of the art is a relevant consideration, but it's also acknowledged that it doesn't get anybody all the way there. And on this point- Well, it may not, but if it's relevant, why shouldn't a jury consider it? Yeah, and that's exactly where I was going to go, Judge Matheson. I think the record here is Mr. Hanneman is the expert who opined as to the so-called availability of this technology, or feasibility, I should say, because it was unrebutted that no large passenger van had this technology. But Mr. Hanneman, who also knew the van had ESC on it, testified clearly in his deposition. And if you'll indulge me, I'll read it to you. It's from Appellant's second volume of their Appendix on Appeal, pages 179 to 180. He was asked essentially what I think is the consumer expectations question. You're not saying here that in 2013 the ordinary consumer expected their vehicle to break for them, correct? Answer me, no. And you're not saying that in 2013 the ordinary consumer expected the vehicle to provide an advanced warning of the vehicle directly in its path or in its lane of travel, correct? Answer, no. And then he goes on. That's the consumer expectations test, and their lead design expert specifically said consumers wouldn't expect it. And I heard some talk about the Butler case. You know, Mr. Connell here, who was the driver in this undeniable tragic accident, was superiorly trained. I mean, in fact, his job description was to drive this and other large passenger vans across the United States and had specific training on this van and its features. And there was some questioning from you, Judge Abell, about, you know, how would we know about this? And I don't know if any of your honors have a car with FCW or AED and some of these other advanced features, but I would submit that they're not unnoticeable to the average consumer. I mean, you will see these, you know, alerts and braking happen in a lot of different situations. So I'm a little bit confused. What's been said, was ESC mandated by the federal government at the time this truck was made, or wasn't it? Yes, Your Honor, it was mandated. There was an advance notice of proposed rulemaking. But ESC was not on this truck. I'm sorry, ESC was. But nobody knew the impact of that when it was running in connection with the other features that the truck had. Well, I have to push back on the premise a little bit because no one has testified that nobody knew about ESC. That's much argument here on appeal. None of their experts say that no one knew about ESC or its features, and I think it defies common sense. Because in 2004, General Motors equipped all of its 15 passenger vans with this feature. In 2007, NHTSA, the National Highway Traffic Safety Administration, proposed a rule saying you're going to need to put this on all of your vehicles. And in the years prior to its manufacture, ESC was mandatory technology. And in fact, there's evidence in the record, and I apologize, I'm not sure that I have the citation with me up at the lectern, that 80% of all vehicles on the market in 2013 had ESC. When it was mandated, did the National Transportation Authority study or make any disclosures nationally about the impact of ESC on braking time? I don't know the answer to that question. The record doesn't have anything on that. I don't believe so, and that takes me to a point that I actually wanted to circle back to. I sincerely submit that this ESC sort of gloss on the appellant's arguments is not preserved and is, in fact, forfeited. You heard citations to various points in the district court briefing. Those were citations to the introduction, the statement of facts, and we know from the Butler case that it's not incumbent upon the district court to integrate the non-movement statement of disputed facts with the law. The one time ESC is mentioned in the argument section, it's appellant's appendix, volume 5, page 16, and I quote, the history of other safety systems like ABS and ESC shows that consumers would have expected manufacturers like GM to install safety systems in their vehicles when those systems could do a better job of reacting. That's without citation, and I would submit is the safest available alternative sort of task that Oklahoma courts have again and again rejected. My friend on the other side says that the Lampe case from the Oklahoma—I'm sorry, did you have a question? Well, I think you're approaching it, so let me go ahead and ask it, and this is something I ask counsel. I'm still a little unclear on the relationship between the consumer expectation test and this failure to warn argument, latent defects. Could you speak to that? So I will be candid with the court. I think it is a little unclear in Oklahoma law. We cite the Dixon v. Outboard Marine Corporation case. That's an Oklahoma Supreme Court case from 1970, 481 Pacific 2nd at 157 that essentially says—I mean, the quote is there's no reason to warn of a nonexistent defect. But that to me says that if it is not effective in design, you cannot then have a warningless claim. But I will concede that there is some undercurrent in the Braswell case in footnote 3 that talks about design defect and inadequate warnings being different methods of proof under Oklahoma law. I submit that this court doesn't need to necessarily parse out that detail in order to get here. I think the court in Butler did a lot of the work on this very similar question. Well, indulge me, though, a little bit here. If there is a freestanding failure to warn argument that that's what made the product effective, what's your best counter to that? In terms of evidence or case law, Your Honor? Well, let's try both. Okay, certainly. I think there are a couple of pieces of evidence that I would point to. One is Mr. Hanneman's statement. The other is Mr. Connell's statement that he didn't expect this breaking. I think, you know, and I'm going to quote from the district court opinion, that the driver's responsibility for avoiding collisions by limiting speed, braking, and steering has been an inherent and well-understood characteristic of automobile operation for over a century. It's on point with this here, too, because consumers in the marketplace didn't expect that cars would break for them, just like in Lamke. They didn't expect cigarettes would put themselves out. And so the shift in consumer expectations suggests that there was nothing to warn about. This van met the expectations because it did exactly what consumers would expect. It broke when you hit the brakes. It steered as you steer. And if you are going over the speed limit and encounter a criminally negligent dump truck driver cutting in front of you, it is within the expectation of the reasonable consumer that that large 15-passener van is not going to stop itself. I think the other point that I would raise to you is I think the district court correctly found that the risk that we're talking about is really the risk of front-to-rear end collisions. And that one is apparent to the ordinary user. That was the district court's framing at slip-off 11, citing the Braswell case. I also think that Butler speaks to this. This is page 1051, 74F4. Plaintiff there claimed that there was no warning that FCW and AEB forward collision warning and automatic emergency braking were available. This court said, that's not even a risk. That's just a piece of information that goes into the consumer buying decision. The risk is a highway accident. And Butler said, that risk is understood by consumers. That risk was understood by the driver here, Mr. Connell. And Mr. Hanneman, when he was asked, point blank, is that something that people would understand? I have it in his, there was a citation to his declaration by my friend on the other side. What was formerly the sealed appendix, I believe it's the redacted appendix. Volume 1, page 186, Mr. Hanneman says, I'm not sure I have the exact quote, but it's something to the effect of consumers understand the risk of front-to-rear collisions. That's what Butler said the risk is in these AEB-FCW cases. And their expert says the consumers knew it. And of course that comports with common sense. Wouldn't that be true of all vehicles? There's always a risk of front-to-rear collisions. I certainly agree with you, but I think that's a defect in the plaintiff's proof, not in the test or General Motors' rebuttal of that proof. That is a risk that was baked into driving this large passenger van at the time that it was designed and manufactured almost a decade ago. Was there testimony from your experts that a consumer would expect that a large van, quite apart from any of these features at all, just the weight and mass of the vehicle, would make it harder to stop? So, we didn't cite any of our experts' testimony on that front. I'm not sure whether plaintiffs ever put that type of testimony into the record. Obviously, on summary judgment, our duty was to point out the lack of facts that would support an ordered consumer expectation. Well, I'm just trying to – if this goes to consumer expectation, that's the issue. Yes. The expectation is not going to be just a vacuum. What does one feature, what does ESC do about braking? Just looking at just that, they're going to look at the whole vehicle, everything about this vehicle. Is it going to be a harder vehicle to stop than my normal passenger car? If so, I need to drive differently. And so, it's not really somebody that they would say, well, there's this factor that would reduce braking by 10%, this would increase it by 3%, and I'm going to do the calculations. They don't think that way. That's exactly right. I'm trying to decide what evidence was in the record on this summary judgment matter about what a reasonable consumer would have expected a non-defective van. Would it have had slower response time to brake? So, I don't think plaintiffs put that evidence into the record. I think the closest that we come to that is Mr. Hanneman's testimony that I quoted to you earlier. The citation of Mr. Hanneman's declaration that I provided earlier and Mr. Connell's testimony that he was trained on this van, knew about, was knowledgeable about its features, and didn't expect AEB or FCW to be on the van. In my waning seconds, I did want to spend just a moment on the negligence per se claim. Again, we think that's pretty clearly forfeited. It showed up once in a footnote in their response, no development of argument, and that's Probari v. Allstate. But General Motors moved on all claims. The district court specifically resolved all claims, and it described one of the allegations in the negligence section as, quote, failures by General Motors to provide information to NHTSA and warn its customers. That's the negligence per se duty that they're saying exists. I'm happy to discuss why those per se duties just are completely wrong as a matter of law, but I understand them all the time. Thank you, Mr. Anderson, unless the panel has anything further. I appreciate your indulgence, and we'd ask that the court affirm. Thank you, counsel. The case will be submitted, and counsel are excused. Thank you for your arguments this morning.